**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **S.S., et al.,** | ) | **CASE NO. 1:12 CV 483** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **Vs.** | ) | |
| | ) | |
| **Leatt Corporation,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

**INTRODUCTION**

This matter is before the Court on Defendant's Motion to Bifurcate Punitive Damages

(Doc. 101).   Also pending are the following: Defendant's Motion in Limine Re Dr. Leatt's Plea

(Doc. 102); Defendant's Motion in Limine to Exclude Other Accidents and Reports (Doc. 103);

Defendant's Motion in Limine to Exclude White Paper Edits by Counsel (Doc. 105);

Defendant's Motion in Limine to Exclude Other Neck Brace Designs (Doc. 106); Plaintiff's

Motions in Limine (Doc. 107); Plaintiff's Motion in Limine Re Dr. Leatt's "White Paper"

(Publication Date May 2012)(Doc. 108); Plaintiff's Memorandum in Support of Motion to

1

Exclude Testing of Terrance Smith (Doc. 109)[1]; and Plaintiff's Motion (sic) in Support of

Motion to Exclude BMW Testing and any Related Conclusions (Doc. 110).  This is a products

liability case.  For the reasons that follow, Defendant's Motion to Bifurcate Punitive Damages

(Doc. 101) is GRANTED in PART and DENIED in PART; Defendant's Motion in Limine Re

Dr. Leatt's Plea (Doc. 102) is GRANTED; Defendant's Motion in Limine to Exclude Other

Accidents and Reports (Doc. 103) is GRANTED; Defendant's Motion in Limine to Exclude

White Paper Edits by Counsel (Doc. 105) is GRANTED in PART and DENIED; Defendant's

Motion in Limine to Exclude Other Neck Brace Designs (Doc. 106) is GRANTED in PART and

DENIED in PART; Plaintiff's Motions in Limine (Doc. 107) are GRANTED in PART and

DENIED in PART; Plaintiff's Motion in Limine Re Dr. Leatt's "White Paper" (Publication Date

May 2012)(Doc. 108) is DENIED AT THIS TIME; Plaintiff's Memorandum in Support of

Motion to Exclude Testing of Terrance Smith (Doc. 109) is DENIED; and Plaintiff's Motion

(sic) in Support of Motion to Exclude BMW Testing and any Related Conclusions (Doc. 110) is

GRANTED at this time.

**ANALYSIS**

A.  Defendant's motions

1.  Motion to bifurcate

Defendant moves to bifurcate punitive damages at trial.  According to defendant, little

evidence exists supporting a punitive damages award.  In addition, defendant argues that

---

[1]    Although the docket reflects that counsel filed this as a "motion,"
the document itself contains only a memorandum in support.
However, in that defendant acknowledges the motion, the Court
will treat it as such.

introduction of defendant's financial statements, which affects only the punitive damages claim, will cause unfair prejudice.  As such, defendant requests that the Court bifurcate the issue at trial. In response, plaintiff argues that judicial economy would be hindered if the Court were to bifurcate the punitive damages claim.  According to plaintiff, defendant argues that the chance of a punitive damages recovery is "close to zero."  If this is true, a second trial would be "wholly inefficient."  Plaintiff further claims that the same evidence required to prove compensatory damages is relevant to punitive damages.  For example, the same witnesses testifying as to negligence would also testify as to "conscious disregard."  Defendant argues that plaintiff fails to indicate how it will be prejudiced by the introduction of financial wealth.

Upon review, the Court finds that bifurcation of the punitive damages aspect of the claim is warranted, although not to the extent requested by defendant.  Pursuant to Federal Rule of Civil Procedure 42(b), this Court may order "separate trials" in order to "avoid prejudice, or expedite and economize."  Whether to bifurcate a trial is entirely within the discretion of the district court. *See, Bath & Body Works, Inc. v. Luizer Personalized Cosmetics, Inc.*, 76 F.3d 743, 747 (6th Cir.1996).  Here, the Court finds that both prejudice and judicial economy weigh in favor of bifurcating the punitive *damages* aspect of the trial.  Plaintiff sustained a serious injury and now suffers from paraplegia.  The Court finds that introduction of defendant's wealth, which affects only the punitive damages aspect of the claim, may cause prejudice to the defendant because the jury may improperly consider defendant's wealth in determining liability.  In addition, issues of judicial economy weigh in favor of bifurcating the amount of punitive damages, as the jury may find in favor of defendant with respect to liability or the *entitlement* to punitive damages, which would entirely eliminate the need for testimony on the *amount* of

3

punitive damages.  On the other hand, the Court declines to bifurcate the issue of intent as it relates to plaintiff's punitive damages claim.  Defendant fails to convince the Court that it will suffer prejudice as a result of the introduction of evidence of "fraud and/or malice."  More important, the Court finds that based on defendant's own argument, judicial economy will be served by allowing the introduction of evidence of intent during the liability phase of the trial.  According to defendant, very little evidence exists.  As such, evidence on this topic should not take very long to address at trial.  Thus, it is possible that a jury could find that defendant did not act with the requisite degree of intent to support a punitive damages claim and a second phase to determine the amount of punitive damages would be alleviated altogether.  Accordingly, the Court GRANTS defendant's request to bifurcate punitive damages at it relates to defendant's financial condition and the amount of any such damages award.  The Court, however, DENIES defendant's request to bifurcate the issue of intent as it relates to punitive damages.

### 2. Dr. Leatt's guilty plea

Dr. Leatt, the individual who invented the neck brace at issue in this case, plead guilty in South Africa to overbilling medical aids associated with a medical practice.  According to defendant, this conviction is irrelevant and cannot be used for impeachment purposes as it is more than 10 years old.  In response, plaintiff generally argues that the evidence is relevant "regarding [Dr. Leatt's] propensity to tell the truth" and for impeachment purposes.  Plaintiff argues that Federal Rule of Evidence 609(b) does not automatically require exclusion.  Plaintiff generally argues that it has "outlined numerous actions taken by Leatt Corporation, while under the control of Dr. Leatt, which raise suspicion concerning the witness's credibility."  According to plaintiff, the Court should admit the evidence of this basis.

4

Upon review, the Court finds that the conviction cannot be used because it is not relevant to any issue in this case.  Whether Dr. Leatt overbilled medical aids associated with his medical clinic has no bearing on whether the design of the neck brace is faulty.  In addition, Federal Rule of Civil Procedure 609(b) provides that convictions more than 10 years old are admissible "only if the probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect."  Plaintiff fails to provide specific facts and circumstances justifying the admittance of Dr. Leatt's prior conviction.  Nor does the Court finds that the probative value of a 10-year old criminal conviction from South Africa for which defendant received a fine substantially outweighs the prejudicial effect. Accordingly, the Court finds that the conviction may not be used to impeach Dr. Leatt.  The motion is GRANTED.

3.  Other accidents and reports

Defendant moves to prevent plaintiff from introducing evidence of "other accidents." Specifically, defendant describes three previous motocross accidents involving other riders in which they suffered various types of injuries.  According to defendant, evidence about these accidents is inadmissible because the accidents are not substantially similar to the accident and corresponding injury suffered by plaintiff.  Defendant points out that in one of the prior accidents, Bobby Kemmer ("Kemmer") was racing downhill at approximately 40 m.p.h. when he lost control of the motorcycle while nearly 10 feet in the air.  Kemmer landed feet first and then fell forward onto his head, injuring his neck vertebrae.  He suffered no injury to his thoracic spine.  In the second accident, Stephen Barrington's ("Barrington") motorcycle stopped unexpectedly during a hairpin turn.  He was thrown off the motorcycle at 30 m.p.h.  Barrington fell eight vertical feet. In doing so, he landed head first and then flipped head over heels.  He

5

suffered only thoracic injuries.  The third, most recent accident, involved Ryan Reddick, whose foot peg clipped the ground and threw the rider off balance.  He went into the ground "head first" and his back "folded up" over him.

In response, plaintiff argues that it intends to introduce evidence of "several" accidents involving the Leatt brace.  Plaintiff does not identify which accidents he intends to rely on.  Nor does plaintiff respond in any fashion to the three accidents defendant seeks to exclude.  According to plaintiff, these "other incidents" all "share the exact same mechanism for injury and product defect."  And, in each injury, the rider suffered "spinal injuries as a result of the brace's restriction of head movement...."  Because they share the same "mechanism on injury," the prior incidents are admissible.

In a products liability case, prior accidents may be admitted to show either causation or prior notice.  "As a threshold matter, prior accidents must be 'substantially similar' to the one at issue before they will be admitted into evidence."  *Rye v. Black & Decker Mfg. Co.*, 889 F.2d 100, 102 (6th Cir. 1989).  "Substantial similarity means that the accidents must have occurred under similar circumstances or share the same cause."  *Id.*  "This is so in large part because all evidence deemed admissible by the district court must meet the minimal standards of relevancy articulated in Federal Rules of Evidence 401 and 403."  *Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 297 (6th Cir. 2007).  The plaintiff bears the burden of proving the substantial similarity between prior accidents and his own."  *Id.*

In this case, plaintiff fails to meet his burden of showing that any of the three prior accidents is substantially similar to the incident involving plaintiff.  Plaintiff's sweeping argument that all incidents involve the "same mechanism" of injury falls far short of meeting the

test for substantial similarity.  Plaintiff does not even explain the nature of the "mechanism."
The Court further rejects plaintiff's argument that the Court should allow plaintiff to present
evidence of substantial similarity at some later point in time.  The Court afforded plaintiff this
very opportunity in the context of the current motion.  Defendant discussed in detail three prior
incidents and plaintiff wholly failed to present any evidence (or even general argument) in
response to defendant's position.  Motions in *limine* are designed to address these issues *before*
trial and outside the presence of the jury.  Plaintiff could have presented whatever argument or
evidence it believed related to these prior incidents in his brief in opposition.  Having failed to
do so, the Court will not allow plaintiff to present evidence of these other three prior accidents.

Defendant also moves to exclude the expert reports prepared by experts analyzing other
accidents involving the Leatt brace.  According to defendant, these other accidents are not
substantially similar to the one suffered by plaintiff.  In one instance, the rider injured a different
part of his back.  Defendant claims that reports involving these other accidents are inadmissible
and, pursuant to Rule 703 of the Federal Rules of Evidence, the reports cannot be admitted even
if plaintiff's experts relied on the reports in forming their opinions.  In response, plaintiff simply
argues that the Court's *Daubert* opinion "moots" this issue because the Court did not exclude
plaintiff's expert testimony.

Upon review, the Court finds that the reports prepared by experts involving "other
accidents" are inadmissible.[2]  There has been no showing that these other accidents are
substantially similar to the accident involving plaintiff.  Rule 703 provides as follows:

An expert may base an opinion on facts or data in the case that the expert has been made

---

[2]    These include the reports prepared by Bidez and Van Ee.

aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Having concluded that the "other" expert reports are inadmissible, the Court further finds that plaintiff's fails to satisfy the Rule 703 requirements.  Namely, plaintiff wholly fails to offer any argument whatsoever as to why the probative value of these reports substantially outweighs their prejudicial effect.

In connection with the *Daubert* motions, the Court noted that Dr. Burton, one of plaintiff's experts, relied on expert reports prepared by others in forming his opinion.  The Court further noted that, in addition to these expert reports, Dr. Burton relied on a number of other items.  After a thorough review, the Court concluded that Dr. Burton could testify as an expert in this case.  Contrary to plaintiff's argument now, the Court never ruled that these "other" expert reports were themselves admissible. Rather, the Court expressly relied on Rule 703 in its Memorandum of Opinion and Order.  Based on that rule, Dr. Burton's opinion may be admissible even if some of the items on which he relied are inadmissible.  That is precisely what this Court ruled.  Accordingly, the expert reports involving "other accidents" are not admissible at trial.  The motion is GRANTED.

### 4.  White Paper and White Paper edits by counsel

It appears that defendant's "White Paper" is a writing that "documents and explains development of the patented Leatt" brace.  According to defendant, over a period of years the document underwent a number of revisions, "until reaching its penultimate form in April of 2009."  A number of outside individuals accessed the 2009 version of the document.  According

to defendant, it kept a log of "every outside individual or organization allowed to see it."  After receiving patents from the U.S. Patent office in 2011, defendant's CEO directed its attorneys to review the White Paper before it was widely publicized.  The attorneys made a number of revisions to the document and it appears that defendant published this revised version of the White Paper in 2012.

Plaintiff moves to exclude the White Paper as published in 2012 because the brace at issue was manufactured long before the changes to the White Paper occurred.  Therefore, "in the interest of fairness and justice, defendant should not be allowed to use a document created long after the fact."  In response, defendant argues that the document is its primary research and development report regarding the brace.  Defendant claims that the writing documents the science behind the invention.  According to defendant, plaintiff is challenging both the science behind the brace, as well as its performance as a safety device.  The White Paper speaks directly to these issues and, as such, it is relevant.  Defendant further argues that the White Paper meets the test for admissibility as expert testimony under Rule 702, as Dr. Leatt will be testifying as an expert in this case.  Defendant claims that hearsay rule exceptions apply and the White Paper should not be excluded on that basis.

Upon review, the Court simply cannot address relevancy or hearsay until the Court knows the specific context within which either the 2009 or 2012 version is being offered.  The Court has not even been provided with both versions.  That being said, the Court cannot envision the 2012 version being relevant unless relied upon by an expert in forming his or her opinion.[3]

---

[3]      For example, changes that post-date the production and/or sale of the product at issue would have to be relevant in and of themselves to render the 2012 White Paper relevant to the issues in the case.

The Court simply has insufficient information to rule at this time.

On the other hand, the Court rejects defendant's argument that the 2009 version of the White Paper must be excluded[4] because it is covered by the attorney-client privilege or work product doctrine.  According to defendant, it provided the 2009 version to its counsel to prepare the document for mass publication.  Defendant acknowledges, however, that it provided the document to a number of people throughout the world, albeit on a "controlled" basis.

Pursuant to Fed.R.Evid. 501, this Court must look to state law in resolving issues of attorney-client privilege.  "There is no material difference between Ohio's attorney-client privilege and the federal attorney-client privilege." *MA Equipment Leasing, LLC, v. Tilton*, 980 N.E.2d 1072, 1079-80 (Ohio Ct. App. 2012).   Under Ohio law, "(1) where legal advice is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his insistence permanently protected, (7) from disclosure by himself or by the legal advisor, (8) unless the protection is waived." *Id*. at 1080.  "Because a client's voluntary disclosure of confidential information is inconsistent with an assertion of the privilege, voluntary disclosure of confidential communications to a third party waives a claim of privilege with regard to communications on the same subject matter." *Id.  See also, State v. Post*, 513 N.E.2d 754, at syllabus ¶1 (Ohio 1987).  The burden of establishing that the privilege exists is on the person asserting it.  *In re*

_____

> Otherwise, the 2009 White Paper appears to be the relevant document.

[4]  It is not clear whether plaintiff possesses this document.  In defendant's reply brief (ECF 127), defendant notes that plaintiff does not have access to this document for purposes of this litigation.

10

*Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 450 (6th Cir. 1983).

Here, assuming that the "draft" version of the White Paper is otherwise privileged[5], the Court finds that defendant waived the privilege as it relates to the document by disclosing it to various individuals. As defendant acknowledges in Exhibit B attached to ECF 105, Leatt disclosed the 2009 White Paper to well over twenty individuals employed by a number of outside companies and universities. It appears that Leatt even disclosed the 2009 White Paper to a journalist. Although defendant argues that access was granted on a "need to know" basis, defendant makes no argument that the disclosures were inadvertent. To the contrary, defendant kept a detailed access log. Defendant provides no law even suggesting that the attorney-client privilege remains intact even in the face of this level of third-party disclosure. Regardless of the fact that the 2009 White Paper may not have been widely disseminated, it was nonetheless voluntarily disclosed to a number of third parties. In all, defendant fails to establish that the attorney-client privilege prevents plaintiff from introducing the 2009 version of the White Paper.

In its reply brief, defendant argues that any questioning regarding "why" certain changes were made is protected by the attorney-client privilege. Thus, even if the 2009 version of the White Paper is admissible, plaintiff cannot ask defendant "why" it made certain changes because those questions invade the attorney-client privilege by impermissibly seeking the disclosure of attorney communications. This Court finds that defendant's request is overbroad. Plaintiff is permitted to ask defendant why it made certain changes. It is very possible that some changes

---

[5]     There is some disagreement as to whether draft versions of documents ultimately disclosed to the public are even covered by the attorney client privilege. *See, Schenet v. Anderson*, 678 F.Supp. 1280 (E.D Mich. 1988). It does not appear that the Sixth Circuit has directly spoken on the issue.

were made independently of defendant's attorneys.  Moreover, the attorney client-privilege does not protect the fact that an individual sought legal advice.  Rather, it protects the substance of the communications.  Thus, plaintiff can ask defendant why he made certain changes.  In the event plaintiff responds that he made changes based solely upon advice of counsel, the Court will revisit this issue after hearing specific testimony regarding the changes.

Defendant also argues that the work product doctrine prevents plaintiff from introducing the 2009 White Paper.[6]  According to defendant, changes to the 2009 document were made during the pendency of this lawsuit, which renders the 2009 document inadmissible.

"[T]he work product doctrine 'is distinct from and broader than the attorney-client privilege.' " *In re Antitrust Grand Jury*, 805 F.2d 155, 163 (6th Cir.1986) *(quoting United States v. Nobles*, 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)). While the attorney-client privilege protects only confidential communications, the work product doctrine generally protects from disclosure documents prepared by or for an attorney in anticipation of litigation. *Id*.; *see also Hickman v. Taylor*, 329 U.S. 495, 510-12, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

Thus, the work product doctrine is broader than the attorney-client privilege and extends to cover documents prepared by an attorney in anticipation of litigation.  Clearly, the 2009 version of the White Paper was created without the input of an attorney.  Thus, this version is not covered by the work product doctrine.   Defendant's arguments are rejected.[7]

Accordingly, plaintiff's motion to exclude the 2012 White Paper is DENIED AT THIS

---

[6]     Defendant opposed plaintiff's motion to exclude the 2012 White Paper.  Therefore, the Court need not address whether the work product doctrine prevents introduction of this version as it appears that defendant will seek to introduce it into evidence.

[7]     Because the Court finds that questions regarding changes to the document are governed by the attorney-client privilege, the Court need not reach whether these questions are also covered by the work product doctrine.

TIME.  Defendant's motion to exclude "attorney edits" is GRANTED in PART and DENIED in PART.

### 5.  Other neck brace designs

Defendant moves to exclude evidence of other neck brace designs.  Specifically, defendant argues that neck braces manufactured by competitors are not relevant to whether defendant's neck brace design is defective.  Defendant further moves to exclude evidence of changes made to defendant's neck brace that occurred after plaintiff's injury.  In response, plaintiff points out that the Ohio Revised Code expressly identifies "alternative designs" as a factor to analyze in a design defect case.  According to plaintiff, Courts will often employ a fact-specific inquiry to determine whether the alternative design is "substantially similar" to the product at issue.  Plaintiff argues that defendant erroneously claims that a blanket rule of exclusion applies.  In reply, defendant generically argues that the products designed by other manufactures "provide different mechanisms for rider protection, cost varying amounts, and...protect different regions of the neck/spine."

Upon review, the Court denies defendant's motion as it relates to other neck brace designs.  As an initial matter, the Court agrees with plaintiff that, under Ohio law, evidence of a "technically feasible alternative design" may be relevant to a defective design claim brought pursuant to O.R.C. § 2307.75.  *See*, O.R.C. § 2307.75; *See also, Cox v. Oliver Machinery Co.*, 534 N.E.2d 855, 858 (noting that factors relevant to determining whether a design is defective include cost of alternative designs and the new or additional harm that might result from alternative design).  The parties do not appear to dispute that these "alternative designs" must be similar to the product at issue.  In this case, however, defendant only generally mentions these

13

"alternative designs" and does not provide the Court with any argument as to how each design differs from that product sold by defendant.  Therefore, plaintiff did not respond with any argument discussing the similarities between the "alternative designs."  As a result, the Court cannot say that the alternative designs are inadmissible due to a lack of similarity.

The Court does note, however, that any analysis of an alternative design would require expert testimony.  *See, e.g., Romans v. Texas Instruments, Inc.*, 2013 WL 6094299 (Oh. Ct. App. Nov. 18, 2013)("A plaintiff asserting a design defect must present expert testimony that an alternative design was economically and technically feasible where the existence of such an alternative design is beyond the knowledge possessed by an average lay person."); *Nationwide Mut. Ins. Co. v. Icon Health and Fitness, Inc.*, 2005 WL 1252543 (Oh. Ct. App. May 26, 2005)(trial court erred in admitting evidence of alternative design provided by non-qualified expert).  Defendant argues that Martha Bidez authored a report for other litigation discussing alternative designs.  The Court notes, however, that the Court ruled earlier in this Opinion that the report is inadmissible.  The Court does not know whether plaintiff possesses other expert testimony on the issue of alternative designs.  Therefore, the Court cannot say at this time whether such evidence is allowable.

Defendant also argues that any post-accident designs are inadmissible.  According to defendant, Federal Rule of Evidence 407 precludes admission.  In response, plaintiff argues that defendant concedes that, while such evidence is inadmissible to prove certain things, it is admissible to the feasability of precautionary measures.  According to plaintiff, it intends to introduce such evidence.  In reply, defendant indicates that it does not dispute the feasability of other designs.

14

Upon review, the Court finds that post-accident design changes are inadmissible.  Rule 407 provides:

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
>
> • negligence;
>
> • culpable conduct;
>
> • a defect in a product or its design; or
>
> • a need for a warning or instruction.
>
> But the court may admit this evidence for another purpose, such as impeachment or –if disputed–proving ownership, control, or the feasibility of precautionary measures.

Here, defendant indicates that it does not dispute ownership, control, or the feasibility of precautionary measures.  Plaintiff offers no other argument as to why the evidence should be admitted.  Defendant's motion to exclude evidence of post-accident design changes is granted. Therefore, defendant's motion to exclude other neck brace designs is GRANTED in PART and DENIED in PART.

B.  Plaintiff's motions

1.  Plaintiff's omnibus motion

a. Lay opinions as to causation and product design

Plaintiff argues that the Rules of Evidence prohibit lay witnesses from offering opinions on causation and product design.  Other than generally reciting the rules of evidence in this regard, plaintiff does not seek to exclude any specific testimony.  In response, defendant indicates that it does not seek to violate the Rules of Evidence.  Upon review, the Court finds that plaintiff is not asking for any specific relief at this time.  Accordingly, none will be afforded.

### b.  Collateral source payments

Plaintiff argues that the collateral source rule prohibits the introduction of payments plaintiff received from sources other than the wrongdoer who have certain subrogation rights. Thus, for example, to the extent plaintiff received payments from a health insurance company for medical expenses, those payments are not admissible to reduce plaintiff's damages.  Defendant does not appear to dispute this assertion and the Court finds that plaintiff is correct in this regard. *See*, O.R.C. § 2315.20.   On the other hand, defendant correctly notes that "write-offs" or "write-downs" are admissible.  *See, Jaques v. Manton*, 928 N.E.2d 434 (Ohio 2010).  Thus, to the extent any collateral sources with subrogation rights as defined in O.R.C. § 2315.20 made payments to plaintiff, those payments are inadimssible. Any write-offs or write-downs, however, are admissible at trial.

### c.  References to "present value, inflation, or discount rate"

Plaintiff moves to preclude defendant from referring to "present value," "inflation," or "discount rate."  In support of his position, plaintiff relies on *Howard v. Chesapeake & O.R. Co.*, 812 F.2d 282 (6th Cir. 1987).  In response, defendant argues that *Howard* does not stand for the proposition espoused by plaintiff and instead actually points out that a district court would err if it instructs a jury not to consider "future increases or decreases in the purchasing power of money."

Upon review, the Court denies plaintiff's motion.  Plaintiff provides the Court with no authority indicating that these concepts are excluded as a rule.  Neither party points to any specific evidence related to these concepts and, as such, the Court can make no determinative ruling at this time.

d.  Tax consequences

The parties stipulate that no evidence will be introduced regarding the tax consequences of any damages award.

e.  References to liability of non-parties

The parties stipulate that no evidence will be introduced regarding the liability of non-parties.

f.  Other court limitations on plaintiff's expert

Plaintiff moves to exclude references to other *Daubert* opinions issued by other courts in other cases.  As a general matter, the Court agrees with plaintiff that judicial opinions in other cases would not be admissible in this case because the opinion would not be relevant to any issue the jury will be considering.  Defendant, however, notes that the evidence may be admissible for impeachment purposes.  Although unlikely, the Court agrees that there may be very limited instances in which a *Daubert* opinion may be used for impeachment purposes.  The Court will address this issue if necessary during trial.

g.  X-rays, articles, or studies relating to the lordatic curve

Plaintiff moves to exclude "x-rays, articles, or studies relating to the lordatic curve" on the grounds that certain information was not provided to plaintiff during discovery.  It appears that plaintiff is referring to information relied on by Dr. Leatt in disputing counsel's assertion that the restriction of the flexion results in loss of the normal lordatic curve.  Counsel then questioned Dr. Leatt as to the basis for this belief.  In response, Dr. Leatt indicated that he reviewed x-rays images and an unpublished article authored by an Australian radiologist.  In response, defendant indicates that it is not seeking to introduce the article.  Defendant notes,

17

however, that plaintiff's request appears to encompass "all x-rays."  Defendant indicates that it does intend to introduce x-rays submitted in connection with Dr. Mitchell Garber's expert report. According to defendant, plaintiff does not challenge Dr. Garber's x-rays.  In reply, plaintiff makes no mention of Dr. Garber's x-rays and continues to discuss only the report prepared by the Australian radiologist.

Upon review, the Court finds that plaintiff's motion is well-taken to the extent it relates to the report prepared by the Australian radiologist and any x-rays discussed therein.  Defendant does not intend to introduce this evidence at trial.  The motion is denied, however, as it relates broadly to all "x-rays."  Defendant points out that other x-rays are relevant to this case, including those contained in the report of Dr. Garber. Plaintiff makes no mention of these x-rays and it is not clear that plaintiff even seeks to exclude them.  Accordingly, the Court's ruling is limited to the report prepared by the Australian radiologist and x-rays discussed therein.

### h. Crash sequence not involving plaintiff

In one sentence, plaintiff argues, "defendants have failed to meet the burden of showing any such accident was substantially similar to the accident which resulted in [plaintiff's] injuries."  Plaintiff does not discuss any such "similar accident" or point out any differences between any "crash sequence" at issue and the one involving plaintiff.  In response, defendant argues that plaintiff's "argument" is insufficient because it does "not provide sufficient information about a 'crash sequence' or the purpose for such evidence, to allow [defendant] to more fully respond.  Upon review, the Court agrees with defendant.  Plaintiff fails to discuss or identify any prior accident that he seeks to exclude.  Accordingly, the motion is denied.

### i. Injury reports of other Leatt brace users

18

Plaintiff moves to exclude injury reports of other Leatt brace users on the grounds that the documents are hearsay and the business records exception does not apply.  In addition, plaintiff argues that there is no indication that the reports sent in by other injured riders involve accidents substantially similar to the one involving plaintiff.  In response, defendant argues that the business records exception applies.  Defendant does not respond to plaintiff's argument about substantial similarity.

Upon review, the Court finds that the business records exception does not apply and, therefore, injury reports of other Leatt brace users are inadmissible.  Under the business records exception,

> [a] business record is admissible under Rule 803(6) where a sufficient foundation for reliability is established. Business records are properly admitted under the business records exception to the hearsay rule if they satisfy four requirements: (1) they must have been made in the course of regularly conducted business activities; (2) they must have been kept in the regular course of business; (3) the regular practice of that business must have been to have made the memorandum; and (4) the memorandum must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.

*U.S. v. Cecil*, (6th Cir. 2010).

"The essential component of the business records exception is that each actor in the chain of information is under a business duty or compulsion to provide accurate information."  *United States v. McIntyre*, 997 F.2d 687, 699 (10th Cir.1993)(cited with approval in *Cecil*).  *See also, Wielgus v. Ryobi Tech., Inc.*, 893 F.Supp.2d 920 (N.D. Ill. 2012)(customer self-reports of accidents are not admissible under business records exception because customers are not under a business duty to provide information).  Here, like in *Wielgus*, Leatt's customers are under no duty, business or otherwise, to report any accidents.  Therefore, as noted in *Cecil*, there is a "break in the chain" of trustworthiness and the records are inadmissible.

j.  Awards or certifications that the Leatt brace has received

Plaintiff moves to exclude evidence of awards or certifications received by defendant for the Leatt Brace.  According to plaintiff, such evidence is disguised inadmissible character evidence.  In addition, plaintiff argues that any evidence relating to the "Conformité Europeénne" mark is inadmissible.  Plaintiff claims that the "mark" involves environmental or health considerations, not neck safety.  Plaintiff claims that there is no certification or test involving neck braces in an unrestrained torso environment.  According to defendant, while awards may not be admissible, certifications can be admissible under Fed. R. Evid. 803(c), *i.e.*, the business records exception to the hearsay rule.  Defendant claims that plaintiff mischaracterizes defendant's certification information.  According to defendant, a number of international safety standards apply to protective equipment worn by motorcycle riders. Defendant argues that  independent certifications are relevant to plaintiff's claim that defendant produced an untested product.  Defendant claims that independent testing by independent laboratories meets the admissibility requirements set forth in Rule 803(c).

Upon review, the Court finds that any "awards" received by defendant are inadmissible. In addition, the Court agrees with plaintiff that Conformité Europeénne "mark certification" is inadmissible.  Plaintiff argues that the mark relates to environmental and health concerns that have no bearing on neck safety.  In response, defendant cites the Court to the index related to its document production.  Specifically, defendant identifies testing involving the brace, as well as a test report and an email regarding comments for pendulum testing.  Neither of these citations appears to have any bearing on the Conformité Europeénne "mark certification."  In addition, defendant purports to support its argument with a citation to its interrogatory responses in which

defendant identifies a number of "voluntary" or "mandatory" standards that it claims are applicable.  Again, these standards do not appear to have anything to do with the Conformité Europeénne "mark certification."  In addition, the vast majority of the standards are international standards and there is no indication that defendant received any "certifications" for any alleged compliance with these standards.   Accordingly, the Court finds plaintiff's motion to be well-taken.

### k.  Hansjurgen Kreitmeier

Plaintiff moves to exclude Hansjurgen Kreitmeier from testifying as an expert witness because he did not provide an expert report.  In response, defendant indicates that it is not calling Kreitmeier as an expert witness.  Rather, it appears that to the extent Kreitmeier testifies, it will be solely to identify and authenticate BMW Group's test materials.  Accordingly, plaintiff's motion is granted to the extent it seeks to exclude Kreitmeier from testifying as an expert witness.

### l.  Plaintiff's assumption of the risk

Plaintiff asks the Court to preclude defendant from "asserting or mentioning that plaintiff assumed the risk of his injuries."  According to plaintiff, while plaintiff may have assumed the risk of engaging in the sport of motocross, he did not assume the risk of injury caused by the Leatt brace.  In response, defendant argues that this is a substantive legal issue, not an evidentiary issue.  Therefore, the issue should be addressed after the close of evidence.

Upon review, the Court agrees with defendant.  Plaintiff has not identified any evidence that he seeks to exclude.  Rather, it appears that plaintiff is requesting a substantive ruling that he did not assume the risk and, therefore, the doctrine is unavailable to the defendant during the

proceedings.  This issue, however, should have been raised on summary judgment.  Plaintiff did not do so and the Court will not address it now.  Defendant is permitted to introduce evidence relevant to the assumption of the risk doctrine and plaintiff may seek a directed verdict if he believes that the evidence is insufficient to go to the jury.

### m.  Dangerousness of motocross

Plaintiff requests that the Court prohibit the parties from mentioning or asserting that motocross is a dangerous sport.  According to plaintiff, he will be unduly prejudiced by any such references because the references will distract and mislead the jury from focusing on whether the neck brace caused plaintiff's injuries.  In response, defendant argues that there is no basis on which to grant the relief plaintiff requests.  Motocross is a dangerous sport and the brace, which is at the heart of the case, is itself evidence that motocross is a dangerous sport.

Upon review, the Court agrees with defendant.  It is self-evident that motocross is a dangerous sport and the Court finds that the jury would not be unduly prejudiced if the parties referred to the sport as such.

### n.  Plaintiff's negligence

Plaintiff asks that the Court prohibit defendant from referring to or mentioning any negligence on the part of plaintiff.  According to plaintiff, defendant has nothing more than insinuation or innuendo and that no actual evidence exists.  Defendant responds that it intends to introduce evidence of plaintiff's negligence, as well as that of his parents.  According to defendant, plaintiff was a boy too young to hold a driver's license jumping obstacles when he lost control, "cased" a jump, and went head first over the handlebars.  In response, plaintiff cites to deposition testimony indicating that plaintiff "rarely" fell off his motocross bike.

22

Upon review, the Court finds plaintiff's request as to negligence, like that of assumption of the risk, does not seek an evidentiary ruling.  Plaintiff and defendant dispute whether the evidence is sufficient to establish plaintiff's negligence.  This is not properly raised in a motion *in limine*.  The parties can introduce their respective evidence and, if plaintiff so chooses, he can seek a directed verdict at the close of evidence.

### 2.  Leatt's White Paper

The Court addressed this motion above in connection with the White Paper edits by counsel. The motion is DENIED.

### 3.  Testing by Terrance Smith

Plaintiff moves to exclude testing performed by Terrance Smith, one of defendant's expert witnesses.  According to plaintiff, the testing is unreliable because it uses a test dummy that is not as "biofidelic" as the human neck.  In addition, plaintiff argues that Smith utilized a custom software program to filter data.  Plaintiff claims he had "no opportunity" to verify the accuracy of the expert's methodology.  Plaintiff further argues that the testing performed on Smith is unreliable because it was performed under different circumstances than those that led to plaintiff's injuries.

In response, defendant argues that the *Daubert* motion deadline long since passed and the Court should not permit plaintiff to file this motion more than six months late.  Defendant also points out that plaintiff did in fact file a motion to exclude Terrance Smith's testing and then later voluntarily withdrew the motion.  As such, defendant requests that the motion be stricken by the Court as an untimely *Daubert* motion.

Upon review, the Court agrees with defendant.  As an initial matter, the parties filed a

23

number of *Daubert* motions over six months ago. Those motions were fully addressed by this Court. The Court simply cannot countenance plaintiff's failure to abide by the Court's deadlines. Moreover, plaintiff fails to offer any reasonable explanation as to why he failed to previously seek to exclude the testing performed by Smith. Regardless, the Court has reviewed the arguments made by plaintiff and finds nothing so glaring as to require the Court to exclude the evidence even in the face of plaintiff's delay. Rather, the issues are better resolved through cross-examination. Accordingly, the motion is DENIED.

        4. BMW Testing

Plaintiff moves to exclude BMW testing. According to plaintiff, it has never been provided with "the test reports, detailed explanations of the study design, the methodology, or the data collection of the testing conducted." As such, plaintiff was never able to review, analyze, or refute the testing. In support of his position, plaintiff presents a convoluted analysis of events that transpired in other litigation. It appears that plaintiff is attempting to establish that defendant either possessed BMW information or had the right to acquire the information from BMW. According to plaintiff, testimony from a deposition in another case shows that a "binder" reflects the tests results, but "no dimensions of how the tests were performed." Plaintiff also attempts to point out that defendant testified that BMW may have "an internal working document to evaluate the efficacy of the brace," but that defendant does not possess the document. Plaintiff requests relief under Fed.R.Civ.Proc. 37(c)(1). In addition, plaintiff argues that no expert can reasonably rely on BMW testing because "the test reports, detailed explanations of the study design, the methodology, or the data collection of the testing conducted" are not available to plaintiff and his experts. Nor could defendant's experts rely on

the testing that "no one has the parameters for."

In response, defendant moves to strike the motion as an untimely discovery motion. According to defendant, plaintiff is seeking additional information underlying the testing, yet plaintiff never requested any such materials during discovery.  Regardless, defendant argues that it already produced "all test data generated by 'BMW pendulum testing' and 'BMW quasi-static testing and calculations of hyperflexion, lateral flexion, and hypertension."  Defendant notes that this information was produced as bates labeled documents LE00874-LE01869.  In addition, defendant notes that in its interrogatory responses, defendant thoroughly detailed the relationship between itself and BMW.  Defendant argues as follows:

> Long before plaintiffs filed this lawsuit, BMW Group shared with [defendant] all the pendulum testing data as well as photographs of the tests themselves.  The same is true for all of BMW's Group quasi-static test data and photographs.  The record before the Court amply demonstrates all these materials were produced during discovery....  The possibility BMW Group might possess product tests not shared with [defendant] does not render the produced data and photographs inadmissible.

(ECF 120 at p. 5).

Defendant goes on to argue that the testing is relevant, Dr. Leatt is capable of establishing the proper foundation, and the BMW testing qualifies for admissibility under the business records exception to the hearsay rule.  Defendant also argues that Dr. Leatt is able to refer to the testing documents in the context of his opinion testimony.

In reply, plaintiff wholly fails to address defendant's contention that it produced all testing data and photographs.  Plaintiff continues to refer to the deposition testimony obtained in a different case that purportedly shows that a "binder" the witness was shown does not provide "dimensions of how the test was performed."  Nor does it contain "experiences made when performing the tests."  In addition, plaintiff argues that neither the business records exception nor

25

the rules regarding expert witnesses applies to the facts of this case.  According to plaintiff, both of these rules require an analysis of whether the testing is reliable.  Plaintiff argues that absent the "complete" set of testing materials, the BMW testing is unreliable and should be excluded.

Upon review, the Court finds that plaintiff fails to establish that the BMW testing should be excluded because the testing is in some way "incomplete."  Simply put, the factual recitation and analysis is confusing, discusses many events that transpired outside of this litigation, and fails to identify any specific document that it requested during discovery in this case that was not provided by defendant.  Of course, the discovery deadline long has passed and the Court will not address these issues now.  Moreover, defendant indicates that it produced all test data generated by BMW pendulum and quasi-static testing.  Plaintiff wholly fails to address this contention or describe what specific information is nonetheless lacking.  Plaintiff's reliance on Rule 37 is similarly misplaced.  That rule discusses whether the proponent of a document can be precluded from introducing it at trial where the document was not identified during discovery.  Here, however, it does not appear that defendant seeks to introduce these "other" documents.  Rather, defendant is seeking to introduce BMW testing, and it does not appear that plaintiff is arguing that these documents were not produced.  Therefore, plaintiff's motion is not well-taken.

On the other hand, the Court is not convinced at this point that Dr. Leatt could properly testify that the BMW testing qualifies under the business records exception to the hearsay rule. Defendant falls short of establishing that Dr. Leatt possesses sufficient knowledge of the testing. Nor is there sufficient information to ascertain whether the BMW testing is a document that qualifies as a "regularly conducted activity" of defendant.  Accordingly, at this point, defendant fails to establish that the hearsay exception is applicable.  In addition, although defendant argues

26

that Dr. Leatt relied on the document in forming his opinion, this factor alone does not render the underlying testing data admissible.  Pursuant to Federal Rule of Evidence 703, otherwise inadmissible data relied upon by an expert may only be disclosed to the jury if the "probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Here, defendant offers no argument on this point and, therefore, the evidence is not admissible under Rule 703.

At this point, the Court GRANTS plaintiff's motion to exclude the BMW testing on the grounds that the hearsay rule bars its introduction.

### **CONCLUSION**

For the foregoing reasons, Defendant's Motion to Bifurcate Punitive Damages is GRANTED in PART and DENIED in PART; Defendant's Motion in Limine Re Dr. Leatt's Plea is GRANTED; Defendant's Motion in Limine to Exclude Other Accidents and Reports is GRANTED; Defendant's Motion in Limine to Exclude White Paper Edits by Counsel is is GRANTED in PART and DENIED in PART; Defendant's Motion in Limine to Exclude Other Neck Brace Designs is GRANTED in PART and DENIED in PART; Plaintiff's Motions in Limine are GRANTED in PART and DENIED in PART; Plaintiff's Motion in Limine Re Dr. Leatt's "White Paper" (Publication Date May 2012) is DENIED AT THIS TIME; Plaintiff's Memorandum in Support of Motion to Exclude Testing of Terrance Smith is DENIED; and Plaintiff's Motion (sic) in Support of Motion to Exclude BMW Testing and any Related Conclusions is GRANTED at this time.

IT IS SO ORDERED.

 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 1/31/14